UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

MR. AND MRS. CATLING, )
individually and as next friends of )
TC, a minor, )
 )
      Plaintiff )
 )
   v. ) 2:19-cv-00110-DBH
 )
YORK SCHOOL DEPARTMENT, )
 )
      Defendant )

**ORDER ON DEFENDANT'S MOTION TO STRIKE/
RECOMMENDED DECISION ON DEFENDANT'S MOTION TO DISMISS**

In this action commenced pursuant to the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. § 1400 et seq., Plaintiffs challenge the decision of the state hearing officer denying Plaintiffs financial reimbursement for their daughter's private educational placement and services. (Complaint ¶¶ 1 – 7, ECF No. 1). The matter is before the Court on Defendant's partial motion to dismiss and motion to strike. (ECF No. 9.)

Following a review of the relevant pleadings and after consideration of the parties' arguments, I deny the motion to strike and recommend the Court deny the partial motion to dismiss.

**STATUTORY BACKGROUND**

Under the IDEA, each state "must provide a free appropriate public education—a FAPE, for short—to all eligible children" in order to receive certain federal funds. *Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist. RE-1*, 137 S. Ct. 988, 993 (2017). A FAPE

includes "special education and related services . . . provided in conformity with [an] individualized education program," or an IEP for short. 20 U.S.C. § 1401(9)(D). An IEP is "[a] comprehensive plan prepared by a child's 'IEP Team' (which includes teachers, school officials, and the child's parents) . . . drafted in compliance with a detailed set of procedures." *Endrew F.*, 137 S. Ct. 988, 994 (2017). An IEP must include, among other requirements, "a statement of the child's present levels of academic achievement and functional performance," 20 U.S.C. § 1414 (d)(1)(A)(i)(I)-(III), "a statement of measurable annual goals" *id.* § 1414 (d)(1)(A)(i)(II), and "a description of how the child's progress . . . will be measured and when periodic reports . . . will be provided." *Id.* § 1414 (d)(1)(A)(i)(III).

"If parents are concerned that their child is not receiving a FAPE, they can file a complaint with the local educational agency." *Pollack v. Reg'l Sch. Unit* 75, 886 F.3d 75, 79 (1st Cir. 2018) (citing 20 U.S.C. § 1415(b)(6)(A)). "They can argue that their child is being denied a FAPE substantively, on the grounds that his or her IEP lacks certain special education or related services." *Id.* at 80 (citing 20 U.S.C. 1415(f)(3)(E)(i)). "And they can argue that their child is being denied a FAPE due to procedural violations that, for example, significantly impede the parents' opportunity to participate in the IDEA decisionmaking process." *Id.* (citing 20 U.S.C. § 1415(f)(3)(E)(ii)(II) (internal quotations and modifications omitted). Filing a complaint begins a series of administrative procedures, including an "impartial due process hearing" before the state educational agency, the Maine Department of Education. 20 U.S.C. § 1415(f)(1)(A), (g); 20-A M.R.S. § 7207-B; 05-071 C.M.R. ch. 101, § XVI. Following the educational agency's final decision on the

complaint, an "aggrieved party" may file an action in state or federal court seeking relief from the decision. 20 U.S.C. § 1415(i)(2)(A).

## FACTUAL AND PROCEDURAL BACKGROUND[1]

### A. The Parties

Plaintiffs are residents of York, Maine, and are the natural parents and legal guardians of T.C., a 16-year old student. (Complaint ¶ 4.) Defendant is a local education agency responsible for educating the children of York, Maine. (*Id.* ¶ 6.)

T.C. has been identified as eligible for special education and related services since 2006, when she was in pre-school. (*Id.* ¶ 9.) The evaluations conducted by Defendant's psychologist revealed that T.C. had challenges in areas of attention, focus, and executive functioning skills, (ADHD), as well as some language skills. (*Id.* ¶¶ 12 – 13.)

### B. Fifth Grade: 2013 – 14 School Year

In February 2014, Plaintiffs, concerned about T.C.'s academic performance in literacy and math, sought evaluations at the Boston Children's Hospital. (*Id.* ¶¶ 16 – 17.) In August 2014, Dr. Debra Waber, a neuropsychologist, found that T.C. had learning disabilities unlikely to be detected by standard psychoeducational testing. (*Id.* ¶¶ 18 – 23.)

### C. Sixth Grade: 2014 – 15 School Year

During the fall of 2014, Defendant consulted with Victoria Papageorge, of Hyperion Learning, a learning disabilities consultant, concerning programming for T.C. (*Id.* ¶¶ 24 –

---

[1] The following statements are drawn primarily from Plaintiffs' complaint, which are accepted as true for purposes of evaluating the pending motion to dismiss. *See McKee v. Cosby*, 874 F.3d 54, 59 (1st Cir. 2017).

28.) Ms. Papageorge recommended a number of changes to T.C.'s IEP, including structured literacy programs from Lindamood-Bell Learning Processes and Sharma Math from the Center for Teaching and Learning Mathematics. (*Id.* ¶¶ 26 – 27.) Defendant later replaced Ms. Papageorge with a different consultant, Dr. Chris Kaufman, a neuropsychologist. (*Id.* ¶ 30.)

After the IEP team maintained the same services in the February 2015 IEP, updating only the IEP goals, Plaintiffs requested additional assessments from the Boston Children's Hospital at public expense. (*Id.* ¶ 31.) Defendant denied the request. (*Id.* ¶ 32.) In April 2015, Plaintiffs hired Ms. Papageorge as an education consultant, who made certain recommendations. (*Id.* ¶¶ 33, 34.) T.C.'s special education teacher followed some, but not all, of Ms. Papageorge's recommendations. (*Id.* ¶ 35.)

**D.      Seventh Grade: 2015 – 16 School Year**

In October 2015, Plaintiffs again requested an updated evaluation from Boston Children's Hospital at public expense. (*Id.* ¶ 37.) Defendant denied the request, explaining that it would conduct its own assessments. (*Id.*) In December 2015, the IEP team reviewed the results of the academic evaluation, and the IEP also considered a report Ms. Papageorge prepared at private expense. (*Id.* ¶ 39.) In late 2015 or early 2016, Plaintiffs obtained additional testing from Boston Children's Hospital at private expense. (*Id.* ¶ 39.) The re-evaluation report endorsed T.C.'s program, but the report noted that T.C. was two to three grade levels behind in reading comprehension and math. (*Id.* ¶¶ 40 – 43.)

In February 2016, the IEP team developed an IEP for the following year that did not include any goals or services to address T.C.'s language deficits identified in the Boston

Children's Hospital re-evaluation; the district considered but rejected the results of the re-evaluation, concluding that the re-evaluation did not meet Maine regulations for special education evaluations. (*Id.* ¶¶ 39, 44 – 45.)

In the spring of 2016, T.C.'s scores on state tests were below expectations in literacy and math. (*Id.* ¶¶ 47 – 51.) Plaintiffs concluded that T.C. had not made significant progress since 2014. (*Id.*)

On May 10, 2016, through a settlement agreement, Plaintiffs and Defendant resolved several due process hearing requests regarding earlier disputes. (*Id.* ¶ 52; Agreement and Release at 2, ECF No. 11.)[2] Defendant agreed to reimburse Plaintiffs or pay to service providers "an amount not to exceed $14,000 (fourteen thousand dollars) for the documented costs of educational services for the Student, private educational evaluations of the Student, and/or attorney fees incurred in connection with" administrative cases 16.037 and 16.046. (Agreement and Release at 2.) In consideration for Defendant's agreement to pay, Plaintiffs agreed to "forever release and discharge" Defendant:

---

[2] The Court may consider the settlement agreement without converting its decision into summary judgment:

> Ordinarily, of course, any consideration of documents not attached to the complaint, or not expressly incorporated therein, is forbidden, unless the proceeding is properly converted into one for summary judgment under Rule 56. However, courts have made narrow exceptions for documents the authenticity of which are not disputed by the parties; for official public records; for documents central to plaintiffs' claim; or for documents sufficiently referred to in the complaint.

*Watterson v. Page*, 987 F.2d 1, 3 (1st Cir. 1993) (internal citation omitted). The First Circuit has determined that relevant settlement agreements fall under this category of permissible documents. *See Alternative Energy, Inc. v. St. Paul Fire & Marine Ins. Co.*, 267 F.3d 30, 34 (1st Cir. 2001) ("Since the [Plaintiff's] complaint fails to state a claim unless [Defendant] retains some measure of liability, which depends upon the interpretation of the . . . Settlement Agreement, the district court properly considered the agreement in granting defendant's motion to dismiss").

from any and all claims, causes of actions, suits, or sums of money, whether legal, equitable, and/or administrative in nature . . . known or unknown and whenever arising, based on the past or existing state of things up through the date of this Agreement, including without limitation any Claims that relate in any way whatsoever to a) [T.C.]'s education by [Defendant] . . . b) any services whatsoever that [T.C.] did or could have received . . . c) the delivery of a [FAPE] to [T.C.], d) reimbursement and compensatory education costs related to [T.C.], e) attorney fees and other litigation costs related to [T.C.], f) reimbursement for or payment of private evaluations . . . and g) any damages incurred by [T.C.] sounding in any way in state or federal law, statutes, or disability laws, and specifically including, and intending to release, all Claims that were or could have been raised in [administrative cases 16.037 and 16.046].

(*Id.*)

On May 12, 2016, the IEP team met to review the report of an assistive technology evaluation conducted by Defendant's evaluator, which evaluation Plaintiffs had requested. (Complaint ¶ 53.) The report recommended further evaluation, which Defendant agreed to conduct. (*Id.* ¶ 54.) Plaintiffs again raised concerns about T.C.'s performance in reading, but Defendant did not make any changes to the IEP regarding reading or math instruction. (*Id.* ¶¶ 54 – 56.) In June 2016, after Plaintiffs received notice that T.C.'s special education teacher would be leaving his position, Plaintiffs requested a meeting, but the IEP team did not convene a meeting to discuss the staffing change. (*Id.* ¶ 57 – 58.)

E.     **Eighth Grade: 2016 – 17 School Year at Learning Skills Academy**

On August 10, 2016, Plaintiffs provided Defendant written notice of their intent to place T.C. at the Learning Skills Academy for eighth grade. (*Id.* ¶ 61.) The Learning Skills Academy is a special purpose private school approved by the state of New Hampshire to instruct students in grades three through twelve with learning disabilities, particularly

speech and language disabilities. (*Id.* ¶ 60.) The Learning Skills Academy has fifty-two students and provides language-based instruction throughout its curriculum. (*Id.*)

In August 2016, Plaintiffs hired Ms. Papageorge to conduct comprehensive academic testing of T.C. to obtain baseline data so they could measure T.C.'s progress at the Learning Skills Academy. (*Id.* ¶ 62.) T.C.'s basic reading skills, as measured by the Woodcock Reading Mastery Test, were in the first percentile. (*Id.*)

The IEP team convened on October 5, 2016 to discuss two evaluations. (*Id.* ¶ 63.) The evaluations revealed significant language-related deficits and recommended a language-based program providing instruction to develop skills and incorporate strategies to better understand language. (*Id.* ¶¶ 64 – 65.) At the meeting, the IEP team members did not offer opinions regarding placement, but the written notice issued after the meeting stated that York Middle School was the least restrictive environment for T.C. (*Id.* ¶ 67.)

In January 2017, T.C. was referred for her triennial evaluation to Dr. Scott Hoch, but Plaintiffs and another evaluator whom Plaintiffs consulted did not believe that Defendant's evaluation was sufficiently comprehensive. (*Id.* ¶¶ 69 – 71.) The annual IEP created on January 31, 2017 updated T.C.'s goals, but Defendant did not discuss an alternate placement. (*Id.* ¶ 72.)

After IEP team meetings earlier in the year, the IEP team met at the end of T.C.'s eighth grade year on June 28, 2017 and adopted the plan T.C. was receiving at the Learning Skills Academy as T.C.'s IEP. (*Id.* ¶¶ 73 – 74.) Although the IEP team members did not state whether the Learning Skills Academy plan could be implemented at York High School, the Special Education Director maintained that the least restrictive placement

7

would be at York High School. (*Id.* ¶¶ 75, 78.) The June 28, 2017, IEP provided for general education classes of about twenty students per class with pull-out services. (*Id.* ¶ 76.) Plaintiffs and their consultants believed, however, that T.C. needed a smaller class size and that the structure of general education classes with pull-out services was not appropriate. (*Id.* ¶¶ 79 – 80.)

**F.     Ninth Grade: 2017 – 18 School Year at Learning Skills Academy**

On January 19, 2018, the IEP team held the annual IEP review. (*Id.* ¶ 85.) The team considered a draft IEP from the Special Education Director, but instead adopted the goals created by the Learning Services Academy. (*Id.*) Despite Plaintiffs' requests to discuss placement options, Defendant did not consider a placement other than York High School. (*Id.*)

Plaintiffs are satisfied with the academic progress T.C. has made since enrolling at the Learning Skills Academy, concluding that T.C. has improved in most every measurement in reading, writing and mathematics. (*Id.* ¶¶ 82 – 83.) Plaintiffs note an increase in T.C.'s writing samples from 142 words at the beginning of eighth grade to 964 words at the end of eighth grade. (*Id.*) On the Woodcock Reading Mastery Test, T.C. improved from the sixth-grade level to ninth-grade level in reading comprehension and from fifth-grade level to 8.8 grade level in basic reading skills. (*Id.* ¶ 84.) T.C. also displayed growth on the Gray Oral Reading Test and the Mathematical Abilities Test. (*Id.*) T.C. is closer to grade level in areas of reading, writing, and math than she has ever been. (*Id.* ¶ 86.)

**G.     The Due Process Hearing**

In late spring or early summer of 2018, Plaintiffs requested an IDEA due process hearing challenging T.C.'s IEPs and seeking reimbursement for the Learning Skills Academy tuition and related costs. (*Id.* ¶¶ 87 – 88, 62.) The hearing occurred on three days in July, five days in August, and three days in September 2018. (*Id.* ¶ 87.)

On December 14, 2018, the Hearing Officer denied Plaintiffs reimbursement, concluding that Defendant offered appropriate IEPs and placement for each of the school years at issue. (*Id.* ¶ 90.) The Hearing Officer determined that as a result of the settlement agreement, Plaintiffs could only challenge the appropriateness of Defendant's IEPs beginning about four months after the settlement agreement. (*Id.* ¶ 91 – 92.)

**H.     The Lawsuit**

In this action, Plaintiffs seek judicial review of the Hearing Officer's decision. (Complaint, ECF No. 1.) Plaintiffs dispute the Hearing Officer's factual conclusions and legal analysis, and question whether she had authority to interpret or enforce a private settlement agreement. (*Id.* ¶¶ 90 – 96.)

Defendant filed a partial motion to dismiss, in which it argues that the settlement agreement precludes Plaintiffs from challenging an IEP until a material change occurred to the conditions that existed at the time of the settlement agreement. (Motion, ECF No. 9.) Defendant contends that Plaintiffs may not pursue claims for events before January 31, 2017. (*Id.* at 7.)

## DISCUSSION

**A.     Motion to Strike**

Defendant asks the Court to strike a significant portion of the allegations in the complaint because they involve events that precede the date of release of claims in a settlement agreement between the parties and events outside the IDEA two-year statute of limitations. A motion to strike portions of a pleading is appropriate only for content that is "redundant, immaterial, impertinent, [or] scandalous." Fed. R. Civ. P. 12(f); *see Boreri v. Fiat S.p.A.*, 763 F.2d 17, 23 (1st Cir. 1985). Motions to strike are "disfavored in practice, and not calculated readily to invoke the court's discretion." *Boreri*, 763 F.2d at 23. "In general, a motion to strike should be denied unless it is clear that the challenged matter can have no possible bearing on the subject matter of the litigation." *McLaughlin v. RCC Atlantic, Inc.*, 269 F.R.D. 56, 57 – 58 (D. Me. 2010) (citations and internal quotation marks omitted). "Rule 12(f) motions are not typically granted without a showing of prejudice to the moving party." *Sheffield v. City of Boston*, 319 F.R.D. 52, 54 (D. Mass. 2016).

Many of the challenged allegations provide relevant background information. While Plaintiffs arguably could have asserted their claim without including the parties' history, as explained below, a central issue to Plaintiffs' ability to maintain their claim is the extent to which T.C.'s needs changed after the date of the parties' settlement agreement. The parties' history is thus relevant to the scope of Plaintiffs' current claim. Under the circumstances, therefore, I cannot conclude that "it is clear" that the challenged allegations "have no possible bearing on the subject matter of the litigation." *McLaughlin*, 269 F.R.D. at 57 – 58. Accordingly, I deny Defendant's motion to strike.

**B.	Motion to Dismiss**

Pursuant to Federal Rule of Civil Procedure 12(b)(6), a party may seek dismissal of "a claim for relief in any pleading" if that party believes that the pleading fails "to state a claim upon which relief can be granted." In its assessment of the motion, a court must "assume the truth of all well-plead facts and give the plaintiff[] the benefit of all reasonable inferences therefrom." *Blanco v. Bath Iron Works Corp.*, 802 F. Supp. 2d 215, 221 (D. Me. 2011) (quoting *Genzyme Corp. v. Fed. Ins. Co.,* 622 F.3d 62, 68 (1st Cir. 2010)). To overcome the motion, a plaintiff must establish that his allegations raise a plausible basis for a fact finder to conclude that the defendant is legally responsible for the claim at issue. *Id.*

Because the February 2016 IEP was in effect for one year, Defendant contends that the May 10, 2016, settlement agreement's release of claims bars Plaintiffs from challenging T.C.'s IEP and placement before the January 31, 2017, amendments to T.C.'s IEP.

In *South Kingstown School Committee v. Joana S.*, 773 F.3d 344 (1st Cir. 2014), the First Circuit found the parties' settlement agreement barred the asserted IDEA claims, noting that "[f]ederal courts regularly give effect to state-law settlement agreements in federal-question cases," and reasoning that the "IDEA plainly permits settlements of disputes within its scope . . . ." *Id.* at 352 – 53. A settlement releasing "any and all causes of action" and consenting to the state of affairs at a particular time "would be meaningless if [a party] could nonetheless turn around the next day and demand the foregone [claims] anew." *Id.* at 353 – 54. A broad IDEA release agreement, therefore, "is best read to release any right to additional [services] that [a party] may have had, except when her request . . .

11

arises from a change in the conditions that prevailed at the time she signed the Agreement." *Id.* at 354. "Such requests, to survive the settlement, must rest on conditions that arose after she entered into that Agreement." *Id.*

In *Joana S.*, the Court did not discuss in detail "the extent to which conditions must change," but looked to whether there were "any changes in [the student]'s behavioral presentations that occurred after the settlement." *Id.* at 355. *See also*, *D.R. by M.R. v. E. Brunswick Bd. of Educ.*, 109 F.3d 896, 900 (3d Cir. 1997) (contrasting a change in a student's "individual circumstances" with a decision "that additional help was needed to deal with [a student]'s *unchanged* condition") (emphasis in original). Defendant's interpretation of the "change in conditions" analysis—that no change in conditions occurred until "the IEP team developed a *new* IEP"— is unpersuasive. (*See* Motion at 2, 8 – 9, ECF No. 9.) Under *Joana S.* and *D.R.*, when a school district has not altered an IEP following a prior settlement, a plaintiff must show that the student's needs have changed, rendering deficient the prior consensual arrangement. When a plaintiff alleges that an IEP does not address changed circumstances, whether the plaintiff can maintain an action despite a prior settlement is not determined by whether the district has declined to alter the IEP after the settlement. The nature and quality of the new evidence concerning the student's needs controls whether the prior agreed-upon plan has become deficient. Otherwise, a school district could insulate an IEP from challenge following a settlement by simply declining to amend the IEP even if new information objectively required an amendment to the plan.

Here, Plaintiffs allege facts which could be support the conclusion that new or more information about T.C.'s disabilities became known or available after the May 10, 2016 settlement agreement. For instance, viewing the facts and the reasonable inferences from the facts in favor of Plaintiffs, Plaintiffs learned of: (1) Defendant's assistive technology evaluation in May 2016, soon after the settlement; (2) Ms. Papageorge's comprehensive testing in August 2016, which revealed that T.C.'s literacy skills might have been at a lower level than previously identified, with performance in the first percentile on the Woodcock Reading Mastery Test; and (3) two evaluations in or about October 2016 evidencing language-related deficits. Plaintiffs have plausibly alleged, therefore, that T.C.'s conditions changed during the eight months following the settlement agreement, or at least that her presentation and the parties' knowledge of her condition changed. Plaintiffs, therefore, have plausibly alleged that the new information required an IEP amendment in order to provide T.C. with a FAPE. Dismissal based on the settlement agreement is thus not appropriate.[3]

## CONCLUSION

Based on the foregoing analysis, I deny Defendant's motion to strike and recommend the Court deny Defendant's partial motion to dismiss. (ECF No. 9.)

---

[3] I acknowledge that Defendant might be able to establish through development of the record that Plaintiffs have failed to satisfy their burden of showing that the May 10, 2016 – January 31, 2017, claims in fact involve changed circumstances to overcome the bar presented by the prior settlement agreement. *See Joanna S.*, 773 F.3d at 353 (analyzing on summary judgment—not a motion to dismiss—whether changed circumstances allowed claims to survive a prior settlement release); *D.R.*, 109 F.3d at 902 (same). At this stage of the proceedings, however, Plaintiffs' allegations control.

**NOTICE**

Any objection to the order on the motion to strike shall be filed in accordance with Federal Rule of Civil Procedure 72.

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which de novo review by the district court is sought, together with a supporting memorandum, within fourteen (14) days of being served with a copy thereof. A responsive memorandum and any request shall be filed within fourteen (14) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to de novo review by the district court and to appeal the district court's order.

/s/ John C. Nivison
U.S. Magistrate Judge

Dated this 20th day of August, 2019.