UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

MR. AND MRS. CATLING,               )
individually and as next friends of      )
TC, a minor,                                   )
                                                      )
        Plaintiffs                   )
                                                      )
    v.                                        )        2:19-cv-00110-DBH
                                                      )
YORK SCHOOL DEPARTMENT,        )
                                                      )
       Defendant                   )

**RECOMMENDED DECISION ON ADMINISTRATIVE RECORD**

Plaintiffs, as parents of T.C., a minor, allege Defendant, T.C.'s school district, violated the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. § 1400 et seq. in connection with T.C.'s education plan.  (Complaint, ECF No. 1.)  Plaintiffs appeal from the results of a due process hearing under the statute, in which proceeding the Hearing Officer found in favor of Defendant.

The matter is before the Court on Plaintiffs' challenge to the Hearing Officer's decision on the administrative record. (ECF No. 27.) Plaintiffs raise both substantive and procedural challenges.

Following a review of the administrative record and after consideration of the parties' arguments, I recommend the Court grant judgment in favor of Defendant.

## STATUTORY BACKGROUND

Under the IDEA, each state "must provide a free appropriate public education—a FAPE, for short—to all eligible children" in order to receive certain federal funds. *Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist. RE-1*, 137 S. Ct. 988, 993 (2017). A FAPE includes "special education and related services . . . provided in conformity with [an] individualized education program," or an IEP for short. 20 U.S.C. § 1401(9)(D). An IEP is "[a] comprehensive plan prepared by a child's 'IEP Team' (which includes teachers, school officials, and the child's parents) . . . drafted in compliance with a detailed set of procedures." *Endrew F.*, 137 S. Ct. at 994. An IEP must include, among other requirements, "a statement of the child's present levels of academic achievement and functional performance," 20 U.S.C. § 1414 (d)(1)(A)(i)(I)-(III), "a statement of measurable annual goals" *id.* § 1414 (d)(1)(A)(i)(II), and "a description of how the child's progress . . . will be measured and when periodic reports . . . will be provided." *Id.* § 1414 (d)(1)(A)(i)(III).

"If parents are concerned that their child is not receiving a FAPE, they can file a complaint with the local educational agency." *Pollack v. Reg'l Sch. Unit* 75, 886 F.3d 75, 79 (1st Cir. 2018) (citing 20 U.S.C. § 1415(b)(6)(A)). "They can argue that their child is being denied a FAPE substantively, on the grounds that his or her IEP lacks certain special education or related services." *Id.* at 80 (citing 20 U.S.C. 1415(f)(3)(E)(i)). "And they can argue that their child is being denied a FAPE due to procedural violations that, for example, significantly impede the parents' opportunity to participate in the IDEA decisionmaking process." *Id.* (citing 20 U.S.C. § 1415(f)(3)(E)(ii)(II) (internal quotations and modifications

2

omitted).  Filing a complaint begins a series of administrative procedures, including an

"impartial due process hearing" before the state educational agency, the Maine Department

of Education.  20 U.S.C. § 1415(f)(1)(A), (g); 20-A M.R.S. § 7207-B; 05-071 C.M.R. ch.

101, § XVI.  Following the educational agency's final decision on the complaint, an

"aggrieved party" may file an action in state or federal court seeking relief from the

decision.  20 U.S.C. § 1415(i)(2)(A).

## FACTUAL AND PROCEDURAL BACKGROUND[1]

### A.    Pre-school through Fifth Grade

T.C. has been identified as eligible for special education and related services since

pre-school and kindergarten.  By fifth grade, Defendant's evaluators determined T.C.'s

educational challenges were caused by Attention Deficit/Hyperactivity Disorder.   Her

progress in math and reading had declined in standardized assessments and her teacher

reported reduced participation.

### B.    Sixth Grade: 2014 – 15 School Year

In August 2014, an evaluation at private expense from the Boston Children's

Hospital determined T.C. possessed "Average to Low Average cognitive potential" with

general academic competence "at the level of a third grade student."  (R. Vol. III at P-144–

45.)  The Hospital report noted that its findings differed from the results of prior school

testing, including the Woodcock-Johnson and WIAT assessments, because [T.C.] could

perform "within normal limits on standardized measures of discrete skills" but had

---

[1] The following facts, unless otherwise indicated, were not disputed and are therefore drawn from the
Hearing Officer's findings.  (See R. Vol. I at 429–520 (hereinafter Administrative Decision)).  Within
citations, (R. ___) refers to pages of the administrative record.

"unusual difficulty integrating information in order to make meaning." (*Id.* at P-145–46.) The evaluators concluded that T.C. has a neurological learning disability that was unlikely to be detected by standard psychoeducational testing. (*Id.*) The report recommended a "cohesive program in which all her academic instruction is provided in a substantially separate small group setting," as contrasted with a general education and pull out model, "with the goal of transitioning her into components of the general education curriculum" after several years. (*Id.* at P-146–47.)

A consultant for Defendant, Victoria Papageorge, offered recommendations in response to the report, and a new special education teacher, Nick Hanlon, began implementing some, but not all, of the recommendations of the consultant and the Boston Children's Hospital evaluators.

## C.     Seventh Grade: 2015 – 16 School Year

In December 2015, Plaintiffs obtained another Boston Children's Hospital evaluation at private expense. (R. Vol. XI at S–6–55.) According to the evaluators:

> [T.C.] continues to struggle with a significant learning disability, but has made excellent academic progress since her previous evaluation . . . . [A]lthough [T.C.'s] academic functioning continues to be very impaired relative to her grade placement and that of many of her peers, she has made admirable progress since her previous evaluation. . . both academically and emotionally. Her current special education teacher, Mr. Hanlon, has clearly done an excellent job . . . .

(*Id.* at S-58.) [T.C.] performed academically at the 5th grade level in reading and mid-4th to mid-5th grade in mathematics. (*Id.* at S-59.) According to the report, the gains "are impressive and predict . . . her potential for continued success going forward." (*Id.* at S-60.) The report cautioned, however, that T.C. was at risk of struggling with the more abstract

4

and complex curriculum of the secondary level, and that she had made positive gains "only because of the continued psychosocial support and personalized instruction provided by her current special education situation." (*Id.*)

The evaluators wrote, "[T.C.'s] current educational program has been quite successful and is fully endorsed." (*Id.*) The evaluators concluded that Mr. Hanlon's work had been "exceedingly productive and should be continued going forward," and recommended that Mr. Hanlon be "closely involved in any transition to other teachers." (*Id.*) The report cautioned about the difficult transition to high school and recommended "continued intensive support for her academic growth and participation in general education classes." (*Id.* at S-60–61.)

In February 2016, the IEP team developed a similar IEP for the following year, with no suggestion that T.C. required an out-of-district placement. The IEP included the following special services, which accounted for 56% of her school day on average:

- Specially designed instruction in reading for forty-five minutes five times per week;
- Specially designed instruction in curriculum support, preteaching/reteaching, for forty-five minutes two times per week;
- Consultation sixty minutes per month to review accommodations;
- Special education support in language arts for fifty-five minutes four times per week;
- Special education support in math for fifty-five minutes four times per week;
- Extended school year services for four hours in math and reading for five weeks;
- Social work for thirty minutes per week[2]

(*Id.* at S-79–104.)  The IEP team also arranged for an assistive technology evaluation.

---

[2] At Plaintiffs' request, the IEP was modified in March 2016 to remove the social work services, though it remained as part of the IEP due to a clerical error until October 2016.  There was some dispute about the removal of social work services later, but that issue does not appear to be material here.

On May 10, 2016, through a settlement agreement, Plaintiffs and Defendant resolved several due process hearing requests arising out of earlier disputes. (R. Vol. I at 132–34; Agreement and Release at 2, ECF No. 11.)  In consideration for Defendant's agreement to pay for certain services, evaluations, and attorney's fees in the prior cases, Plaintiffs agreed to "forever release and discharge" Defendant:

> from any and all claims, causes of actions, suits, or sums of money, whether legal, equitable, and/or administrative in nature . . . known or unknown and whenever arising, based on the past or existing state of things up through the date of this Agreement, including without limitation any Claims that relate in any way whatsoever to a) [T.C.]'s education by [Defendant] . . . b) any services whatsoever that [T.C.] did or could have received . . . c) the delivery of a [FAPE] to [T.C.], d) reimbursement and compensatory education costs related to [T.C.], e) attorney fees and other litigation costs related to [T.C.], f) reimbursement for or payment of private evaluations . . . and g) any damages incurred by [T.C.] sounding in any way in state or federal law, statutes, or disability laws, and specifically including, and intending to release, all Claims that were or could have been raised in [administrative cases 16.037 and 16.046].

(*Id.*)

On May 12, 2016, the IEP team convened to review the results of the assistive technology evaluation, which included recommendations for technologies such as a text-to-speech tool, earbuds, a note-taking app, and online calendaring. The team agreed to conduct further evaluation and added sixty minutes per month of consultation services to assist T.C. in using the technology.

In June 2016, Plaintiffs learned that Mr. Hanlon would be leaving his position. Plaintiffs requested a meeting, but school personnel wished to delay meeting until they obtained the results of the further evaluation.  In July 2016, T.C. received the ESY services from educational technicians trained and supervised by Mr. Hanlon, but the staffing change

was unexpected and T.C. had difficulty adjusting.  Plaintiffs requested a meeting with Erin Frazier, the new special education director, but the meeting was delayed due to scheduling reasons.  In an email, T.C.'s mother wrote that "Nick Hanlon has done an amazing job with [T.C.] over the past two years and she has made so much progress both academically and emotionally thanks to him and it is our hope we can continue progress with his new teacher."  (R. Vol. IV at P-385.)

At about the same time, Plaintiffs initiated T.C.'s enrollment at the Learning Skills Academy (LSA), a special purpose private school approved by the state of New Hampshire to instruct grades three through twelve with learning disabilities, particularly speech and language disabilities.  T.C.'s mother explained to LSA staff that Plaintiffs had intended for T.C. to remain in Defendant's system for the eighth grade, but Mr. Hanlon's change in position caused Plaintiffs to look at alternative options sooner than they had expected.  On August 10, 2016, Plaintiffs provided Defendant written notice of their intent to place T.C. at LSA for eighth grade.

## D.    Eighth and Ninth Grades: 2016–17 and 2017–18 School Years at LSA

Later in August 2016, Ms. Frazier conducted an evaluation of T.C., (*id.* at S-208–11), and Ms. Papageorge, now consulting for Plaintiffs, conducted comprehensive academic testing to obtain baseline data to enable them to measure T.C.'s progress at LSA. (*Id.* at S-183–207).  On the Comprehensive Test of Phonological Processing, T.C. tested at the thirty-ninth percentile for her grade level in phonological awareness, the thirtieth percentile in phonological memory, and the forty-fifth percentile in rapid naming.  (*Id.* at S-186–88.)  On the Symbol Imagery Test, T.C. tested at the third percentile for her age, or

7

an age seven to eleven equivalency. (*Id.* at S-188–90.) On the Woodcock Reading Mastery Test, T.C. tested at the fifth grade level or the tenth percentile for her age in basic reading skills and the sixth grade level or the nineteenth percentile for reading comprehension. (*Id.* at S-190–193.) On the Test of Reading Comprehension, T.C. tested at the 4.9th grade level or thirty-seventh percentile for her age on the Text Comprehension subtest. (*Id.* at S-193.) On the Comprehensive Mathematical Abilities Test, T.C. tested at the fourth percentile for her grade in general mathematics, at the first percentile in basic calculations, the twenty-first percentile in mathematical reasoning, the thirteenth percentile in advanced calculations, and at the thirty-fifth percentile in practical applications, for an overall global mathematics ability score of the ninth percentile. (*Id.* at S-194–200.)[3]

In September 2016, T.C. underwent the planned speech and language evaluation. (*Id.* at S-212–21.) The results revealed that T.C. was between the ninth and nineteenth percentiles on the four Clinical Evaluation of Language Fundamentals composite scores and was in the fourth and thirteenth percentiles on the two Comprehensive Assessment of Spoken Language composite scores. (*Id.* at S-215–20.) The evaluator made several recommendations for the regular education and special education settings. (*Id.* at S-220–21.)

The IEP was modified in October 2016 in response to the recent evaluations, which modifications included the addition of speech and language goals and additional services twice each week for thirty minutes. Defendant continued to evaluate and observe T.C.

---

[3] Defendant did not receive the results of that evaluation until February 2017.

while she attended LSA, including through a speech and language evaluation in March 2017, a central auditory processing observation in May 2017, and a psychological evaluation report in June 2017.  (R. Vol. XIII at S-491–92.)

The IEP language was updated on several occasions during T.C.'s eighth and ninth grade years, which update included changes to reflect the transition to high school.  The changes also included a reduced number of minutes of specially designed instruction in ninth grade to allow for an increase in the mainstream classroom.  The initial IEP for ninth grade contained the following services, divided between assistance in the general education classroom and the special education setting such that seventy-two percent of T.C.'s time was in the general education setting:

- Specially designed instruction in executive functioning for 120 minutes per week in specific reading and math skills, pre-teaching and re-teaching;
- Specially designed instruction for 200 minutes per week in reading and writing skills;
- Special instruction in math and language arts for ninety minutes each per week
- Special program consultation for sixty minutes twice per week;
- Extended school year services of four hours per week for five weeks;
- Speech and language therapy for thirty minutes twice per week.

(R. Vol. XII at S-402–04.)

In June 2017, the IEP team adopted the goals from the Student Success Plan (SSP) that LSA had been implementing and increased the number of minutes in several of the categories of special instruction, but the team did not incorporate wholesale the accommodations from the SSP into the IEP as Plaintiffs requested.  All relevant parties agreed that LSA's program is appropriate for T.C., and Plaintiffs were satisfied with T.C.'s progress since enrolling at LSA.  Regarding T.C.'s placement, Defendant's staff and

experts believed that the IEP could be implemented in the district; Plaintiffs and the LSA representatives disagreed because they believed T.C. required smaller class sizes and that Defendant's educational model based on general classes with "pull-out" services was insufficient to meet T.C.'s needs.

### E.     The Due Process Hearing and the Lawsuit

In May 2018, Plaintiffs requested an IDEA due process hearing challenging T.C.'s IEPs and seeking reimbursement for the LSA tuition and related costs. The hearing occurred on three days in July, three days in August, and five days in September 2018.

In December 2018, the Hearing Officer determined that as a result of the settlement agreement, Plaintiffs could only challenge the appropriateness of Defendant's IEPs beginning after October 2016. (Administrative Decision at 58–64.) The Hearing Officer denied Plaintiffs' request for reimbursement, (*id.* at 88–89), concluding that Defendant had not denied T.C. a FAPE during any of the school years at issue. (*Id.* at 64–81.) The Hearing Officer also determined the procedural violations Plaintiffs alleged either lacked merit or else did not prejudice Plaintiffs or T.C. (*Id.* at 82–85.)

In March 2019, Plaintiffs sought judicial review of the Hearing Officer's decision. (Complaint, ECF No. 1.)

### STANDARD OF REVIEW

"District courts considering challenges to administrative IDEA decisions apply an intermediate standard of review" often characterized as "involved oversight." *Johnson v. Bos. Pub. Sch.*, 906 F.3d 182, 190–91 (1st Cir. 2018); *Roland M. v. Concord Sch. Comm.*, 910 F.2d 983, 989 (1st Cir. 1990).

A district court reviews the administrative record, which may be supplemented by additional evidence from the parties, and makes an independent ruling based on the preponderance of the evidence. However, that independence is tempered by the requirement that the court give due weight to the hearing officer's findings. As a result, a district court's review "falls somewhere between the highly deferential clear-error standard and the non-deferential de novo standard.

*D.B. ex rel. Elizabeth B. v. Esposito*, 675 F.3d 26, 35–36 (1st Cir. 2012) (internal quotations, modifications, and citations omitted). "When dealing with issues that implicate factual determinations made by the administrative agency, [courts] will give more deference to the hearing officer's findings. However, when confronting an issue that is more a matter of law, [courts] will give less deference as the educational expertise of the agency is not implicated." *Doe v. Cape Elizabeth Sch. Dep't,* No. 2:18-CV-00259-LEW, 2019 WL 1904670, at *9 (D. Me. Apr. 4, 2019) (internal quotations and citations omitted).

In IDEA due process hearings and lawsuits challenging whether a school district has met its procedural and substantive obligations to provide a FAPE, the burden of persuasion rests "as it typically does, on the party seeking relief." *Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 51 (2005).

## DISCUSSION

### A.  Settlement Agreement/Release

Defendants contend that the parties' settlement agreement is a bar to Plaintiffs challenging T.C.'s IEP and placement before the January 31, 2017, amendments to T.C.'s IEP.

Courts enforce agreements to release IDEA claims because "[f]ederal courts regularly give effect to state-law settlement agreements in federal-question cases," and

11

because the "IDEA plainly permits settlements of disputes within its scope . . . ." *South Kingstown School Committee v. Joana S.*, 773 F.3d 344, 352–53 (1st Cir. 2014).   A settlement releasing "any and all causes of action" and consenting to the state of affairs at a particular time "would be meaningless if [a party] could nonetheless turn around the next day and demand the foregone [claims] anew."   *Id.* at 353–54.   A broad IDEA release agreement, therefore, "is best read to release any right to additional [services] that [a party] may have had, except when her request . . . arises from a change in the conditions that prevailed at the time she signed the Agreement."   *Id.* at 354.   Subsequent challenges to the same educational plans in effect at the time of the settlement "must rest on conditions that arose after she entered into that Agreement."   *Id.*   The Court is instructed to look to "any changes in [the student]'s behavioral presentations that occurred after the settlement," *id.* at 355, as contrasted with a new conclusion "that additional help was needed to deal with [a student]'s *unchanged* condition," *D.R. by M.R. v. E. Brunswick Bd. of Educ.*, 109 F.3d 896, 900 (3d Cir. 1997).

The Court denied Defendant's partial motion to dismiss based on the settlement agreement because Plaintiffs identified several sources of potential new information which required development and argument as to whether there had been a change in the conditions since the execution of the agreement. (Recommended Decision at 12–13, ECF No. 15; Order, ECF No. 17.)   A review of the record and the parties' arguments reveals that several of the potential sources of new information after the February 2016 IEP and March 10, 2016 settlement agreement do not constitute changed conditions.   More specifically, the assistive technology evaluation did not reveal new deficiencies or meaningfully inform as

to T.C.'s performance, the consultant's comprehensive testing in 2016 was not revealed to Defendant until 2017, and Plaintiffs have not shown that Mr. Hanlon's departure could establish changed circumstances for T.C. because there is no authority to suggest that a student is entitled to instruction from a specific teacher.

The September 2016 speech and language evaluation, however, reinforced the need for special education services to address T.C.'s significant language related learning disability.  Defendant asserts that this information was not sufficiently novel to constitute changed circumstances given the earlier evaluations, including those from Boston Children's Hospital.  The IEP team's conclusions undermine that argument because the IEP team apparently found that the information and recommendations warranted additional services beginning in October 2016.  For purposes of the remainder of Plaintiffs' claims, therefore, the circumstances arguably changed in the fall of 2016.  As a result, the settlement agreement does not bar Plaintiffs from pursuing their claims related to the IEPs after that time.

## B.    Substantive IDEA Claims

Parents may be entitled under the IDEA to recover tuition and other expenses for private school placements, but "such reimbursement is contingent upon a showing that the parents diligently pursued the provision of appropriate services from the public school system, yet the school system failed to provide those services; and that the private placement is a suitable alternative."  *C.G. ex rel. A.S. v. Five Town Cmty. Sch. Dist.*, 513 F.3d 279, 289 (1st Cir. 2008).  "When the parents make a unilateral choice, they must bear

the associated risk: if the conditions for reimbursement are not met, the financial burdens are theirs." *Id.*

"To meet its substantive obligation under the IDEA, a school must offer an IEP reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Endrew F.*, 137 S. Ct. at 999; *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cty. v. Rowley*, 458 U.S. 176, 207 (1982).  This standard contemplates a "meaningful educational benefit," *Johnson* 906 F.3d at 194, and "is markedly more demanding than [a] 'merely more than de minimis' test . . . ." *Endrew F.*, 137 S. Ct. at 999.  The ultimate question, however, is on "whether the IEP is *reasonable*, not whether the court regards it as ideal." *Id.* at 1000.

"Actual educational progress can (and sometimes will) demonstrate that an IEP provides a FAPE." *Lessard v. Wilton Lyndeborough Coop. Sch. Dist.*, 518 F.3d 18, 29 (1st Cir. 2008).  But "the inverse of this rule" is not always true, because "an inquiring court ought not to condemn [an IEP] ex post merely because the disabled child's progress does not meet the parents' or the educators' expectations." *Id.*

In this case, the record supports the Hearing Officer's determination that the IEPs and placement decisions were reasonably calculated to enable T.C. to make meaningful progress. (*See* Administrative Decision at 64–81.)  First, Plaintiffs did not sustain their burden of establishing the Hearing Officer erred in analyzing any of the asserted deficiencies.  The Hearing Officer thoroughly addressed each amended IEP, discussed each of the asserted deficiencies, noted meritorious concerns and criticisms, but ultimately determined that the IEPs were adequate.  For example, while the Hearing Officer agreed

14

with Plaintiffs and recommended that the October 2016 IEP be clarified because the goals included descriptive levels of functional performance rather than specific age or grade levels, she supportably found that the lack of clarity did not render the IEP unreasonable because the present level of academic performance was included in the body of the IEP and thus the goals were understandable to an educator reading the document.  (*Id.* at 65.) On the auditory processing issue of the June 2017 IEP, the Hearing Officer noted that the evaluator testified that she would not have drafted the functional goal exactly as Defendant had done, but reasonably concluded that the additional detail Plaintiffs desired related to specific instructional methodologies, which Defendant is not required to identify in the IEP.  (*Id.* at 77.)

Furthermore, a review of the record, including Plaintiffs' statements, reveals that the most significant disagreement was about T.C.'s placement, and not about specific provisions of the 2016–18 IEPs. The Hearing Officer noted that by February 2018, "the IEP [was] extensive" and the "accommodations included support in every aspect of her education, both inside and outside of the classroom," but despite the uncontested adequacy of the IEP, the IEP team did not agree on the issue of placement in the District's public high school.  (*Id.* at 79.)  As the Hearing Officer concluded, Plaintiffs' claims ultimately fail because they have not shown that the public schools were incapable of implementing the IEPs or that a private placement was necessary to provide T.C. with a FAPE.

The record supports the Hearing Officer's conclusion that T.C. made meaningful progress within the public school immediately preceding Plaintiffs' unilateral decision to place T.C. at LSA.  The academic test results contained in the December 2015 Boston

Children's Hospital evaluations and the evaluators' endorsement of T.C.'s public school program of instruction is instructive. Plaintiffs contend that T.C.'s progress had stalled between the March 2016 settlement and the August 2016 unilateral private placement. In support of that contention, Plaintiffs cite the mathematics portion of in-class computerized testing in April and May 2016. (*See* R. Vol. XI at S-149.)[4] Plaintiffs' argument is unpersuasive, however, because the argument ignores the progress T.C. made in math relative to the previous year and on the reading portion of the same assessment,[5] and because Plaintiffs' statements in the summer of 2016 demonstrate that they believed T.C. had made significant progress over the two previous years.

The record evidence suggests that Mr. Hanlon's departure played a large role in Plaintiffs' decision to place T.C. in a private school. While Mr. Hanlon's instruction was valuable to T.C., Plaintiffs have not established that Defendant would have been unable to provide a FAPE without Mr. Hanlon's involvement or that the District would have failed to implement T.C.'s IEP unless they retained him. Plaintiffs have not pointed to persuasive evidence that T.C.'s needs were such that a FAPE could not be provided within the District's educational model consisting of "pull-out" services or special support within the

---

[4] T.C.'s scaled score on that STAR math assessment was 691 in October 2015, representing the twenty-sixth percentile, 795 in February 2016, representing the fifty-sixth percentile, and 701 in April and May 2016, representing the twenty-second and twenty-first percentile.

[5] T.C.'s scaled score on the STAR reading assessment was 556 in October 2015, representing the twentieth percentile, 634 in December 2015, representing the twenty-eighth percentile, 562 in April 2016 representing the seventeenth percentile, and 693 in May 2016, representing the thirty-first percentile. (*Id.* at S-155.)

general education classroom.[6]  To the contrary, the record shows that T.C. made progress under that support structure just before Plaintiffs enrolled T.C. in LSA. Despite Plaintiffs' understandable concerns regarding Mr. Hanlon's unavailability and the transition to high school, given T.C.'s significant and demonstrated progress while in the public school during the two years preceding the period at issue in this case, Plaintiffs have not shown that the Hearing Officer erred by concluding that the public school system was capable of implementing the IEPs and providing T.C. a FAPE during the two following years.

## C.    Procedural IDEA Claims

In addition to the substantive requirements of the IDEA, an IEP is subject to procedural requirements flowing from state or federal law.  *Lessard*, 518 F.3d at 23; 20 U.S.C. § 1415(a).  "In matters alleging a procedural violation," the only remedy available is an order to "a local educational agency to comply with procedural requirements," 20 U.S.C. § 1415(f)(3)(E)(iii), unless the procedural inadequacies (1) "impeded the child's right to a [FAPE]," (2) "significantly impeded the parents' opportunity to participate in the decisionmaking processes," or (3) "caused a deprivation of educational benefits."  *Id.* § 1415(f)(3)(E)(ii).  Accordingly, "[w]ithout finding the denial of a FAPE, a hearing officer may do nothing more than order a school district to comply with the Act's various procedural requirements."  *Fry v. Napoleon Cmty. Sch.*, 137 S. Ct. 743, 754 n.6 (2017). "Similarly, a court in IDEA litigation may provide a substantive remedy only when it determines that a school has denied a FAPE."  *Id.* at 754 n.7; s*ee also Maine Sch. Admin.*

---

[6] The primary record support for Plaintiffs' argument is the testimony of Victoria Papageorge, (R. Vol. XXV at 389–92), but, as Defendant notes, other experts disagreed with Ms. Papageorge's conclusions.

*Dist. No. 35 v. Mr. R.*, 321 F.3d 9, 19 (1st Cir. 2003) ("We recognize that compensatory education is not an appropriate remedy for a purely procedural violation of the IDEA").

Given (1) that T.C. made meaningful progress at LSA and that T.C. made meaningful progress in the two years immediately before her placement at LSA, (2) that Plaintiffs have not shown the District was incapable of faithfully implementing the IEPs, and (3) that Plaintiffs failed to demonstrate that the IEPs were not reasonably calculated to provide T.C. with meaningful educational benefit in light of her unique needs, Plaintiffs also failed to establish that any procedural irregularities resulted in the denial of a FAPE or deprived T.C. of educational benefit. The remaining issue, therefore, is whether any procedural violations deprived Plaintiffs of their right to participate meaningfully in the decision-making process.

Plaintiffs argue Defendant refused to engage in discussions regarding placement and thus predetermined the placement issue. Although Defendant consistently maintained that it could provide a FAPE to T.C. and that the public school was T.C.'s least restrictive environment, Defendant's assertion of its position does not imply impermissible predetermination. "Federal law prohibits a completed IEP from being presented at the IEP Team meeting or being otherwise forced on the parents, but states that school evaluators may prepare reports and come with pre-formed opinions regarding the best course of action for the child as long as they are willing to listen to the parents and parents have the opportunity to make objections and suggestions." *J. v. Portland Pub. Sch.*, No. 2:15-CV-00084-DBH, 2016 WL 5940890, at *24 (D. Me. Oct. 12, 2016) (quoting *Nack ex rel. Nack v. Orange City Sch. Dist.*, 454 F.3d 604, 610 (6th Cir. 2006)).

18

The record lacks evidence that Defendant refused to reconsider T.C.'s needs or stopped evaluating whether it could implement the program the IEP team agreed was appropriate.  While discussion regarding placement was limited in some of the IEP team meetings, the limited discussion at that point is consistent with the fact that the relevant issues were well-known to the parties and the parties simply disagreed. The parental involvement and the process here "stands in sharp contrast with those described in cases relied upon by [Plaintiffs] in which courts found" predetermination without any analysis or opportunity to discuss the student's needs.  *Ms. M. ex rel. K.M. v. Portland Sch. Comm.*, No. CIV 02-169-P-H, 2003 WL 21180814, at *21 (D. Me. May 20, 2003) (contrasting cases where a district developed IEP without input from parents, considered no alternatives despite objections and assumed a "take it or leave it" attitude, a district unilaterally changed placement from private residential to public before developing new IEP to support the change, or a district placed a student in particular program solely to serve administrative convenience, without slightest consideration of student's needs).[7]

---

[7] An email communication that Plaintiffs argue the Hearing Officer improperly excluded from the record does not require a different conclusion.  In April 2017, a consultant for Defendant wrote in an email to Ms. Frazier, "We really do need SE reading/ELA services to be 'beefed up' and in place to pass the 'straight-face' test and have a shot at prevailing should we end up in a hearing!"  Ms. Frazier responded and sent a copy to an attorney.  The Hearing Officer excluded that email message from the record citing the attorney-client privilege.  Defendant contends Plaintiffs are foreclosed from relying on the email because it was excluded, and Plaintiffs did not seek to supplement the record with the email. (Defendant's Memorandum at 25 n.15, ECF No. 38.)  Even assuming an evidentiary basis for the argument, however, the exclusion of the email does not warrant a different result.  One consultant's opinion that the IEP required modification before high school is not dispositive.  In addition, because the focus of the dispute by that time (the spring of T.C.'s eighth grade year) involved placement and the ability of the IEP to be implemented within the public school rather than a particular accommodation, the consultant's comment did not address the central issue.

Plaintiffs assert other procedural violations, including the lack of a general education teacher at one of the IEP meetings, and the alleged failure of Defendant to obtain certain information from LSA in time for two IEP meetings.[8]  The issues are subject to reasonable debate, but do not warrant relief.  On the educator attendance issue, for example, Defendant argues that T.C. had no general education teacher to attend the meeting after Plaintiffs unilaterally placed T.C. at LSA; Plaintiffs highlight the fact that the federal and state regulations require the attendance of "[n]ot less than one regular education teacher of the child (if the child is, *or may be*, participating in the regular education environment)." 34 C.F.R. § 300.321 (emphasis supplied); *see also*, MUSER § VI.2.B(2).  Although both positions have some logic, the Court need not resolve that issue or address Plaintiffs' argument regarding the timing and burden of obtaining records because even if Plaintiffs' arguments have merit, Plaintiffs have not established that they or T.C. was prejudiced.  The record does not support a finding that Defendant's failure to consider the information during the February and March 2017 IEPs or the absence of a general education teacher deprived Plaintiffs of meaningful participation in the process.  To the contrary, the record shows a high level of parental and advocate attendance, involvement, and opportunity for meaningful engagement with the other IEP team members.

---

[8] Plaintiffs argue that in upholding the February and March 2017 IEPs, the Hearing Officer improperly failed to consider certain information the IEP team declined to consider at that time because it was not sent to the District in time to review before the meeting. (Administrative Decision at 73.)  Plaintiffs assert that the information should have been considered and that Defendant had an affirmative obligation to obtain the information themselves because Plaintiffs provided consent for Defendant to obtain records from LSA.

### CONCLUSION

Based on the foregoing analysis, I recommend the Court grant judgment in favor of

Defendant.

### <u>NOTICE</u>

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which de novo review by the district court is sought, together with a supporting memorandum, within fourteen (14) days of being served with a copy thereof.  A responsive memorandum and any request shall be filed within fourteen (14) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to de novo review by the district court and to appeal the district court's order.

/s/ John C. Nivison
U.S. Magistrate Judge

Dated this 28th day of October, 2020.